**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **TYRESE WALKER and**<br>**PAMELA MULET WALKER,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF COOKEVILLE, CHARLES**<br>**QUIETT AND DERRICK SPRINGS,**<br>**individually and in their official**<br>**capacities as Police Officers of the City**<br>**of Cookeville Tennessee Police**<br>**Department,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **No. 2:12-00059**<br>   **Judge Sharp** |

## MEMORANDUM

Pending before the Court are fully briefed Motions for Summary Judgment filed by

Defendant police officers Charles Quiett and Derrick Springs (Docket No. 38) and Defendant City

of Cookeville Tennessee Police Department (Docket No. 46). Plaintiff Tyrese Walker and Pamela

Mulet Walker have filed responses in opposition to those motions (Docket Nos. 50 & 55), to which

Defendants have replied (Docket Nos. 53 & 56). For the reasons that follow, Defendants' Motions

for Summary Judgment will be granted, and Plaintiffs' claims will be dismissed.

## I. FACTUAL BACKGROUND

Plaintiffs are married but on the day of the incident which serves as the basis for this lawsuit

they were not.[1] They did, however, live together, along with three children that Mr. Walker had

---

[1] So as to avoid confusion, the Court will refer to Pamela Mulet Walker in this opinion as "Ms.
Mulet."

fathered with Ms. Anessa Kelly. Mr. Walker and Ms. Kelly never married and had not lived together for some time when the incident occurred. No custody order had been entered in regard to the children, nor had there been any paperwork filed seeking custody.

On July 3, 2011, Ms. Kelly went to Mr. Walker's and Ms. Mulet's residence to pick up her children. Apparently rebuffed, Ms. Kelly called the Cookeville Police Department and officers were dispatched to the scene of a domestic disturbance.

Defendant Quiett was the first to arrive on the scene. Defendant Springs arrived several minutes later. Both of their squad cars were equipped with dashboard cameras, and almost the entire episode between the officers and Plaintiffs was captured by one or both of those cameras. Additionally, both officers wore microphones which captured audio of the incident. The following recitation of facts is derived from this Court's review of the audio and video recordings that were taken at the scene. The Court begins with the video and audio captured from Officer Quiett's vehicle and microphone.

Upon arrival, Officer Quiett was met by Mr. Walker and Ms. Kelly. Mr. Walker and Ms. Kelly explained their version of what was happening. Mr. Walker told Officer Quiett that he and Ms. Kelly had two had children together, but that the children had lived with him for three years.

Within minutes of Officer Quiett's arrival, Ms. Mulet came up the street from the park where she had been with the children. She and Ms. Kelly immediately began arguing.[2] Officer Quiett warned both of them on several occasions to stop yelling and to settle down. Ms. Mulet told Officer Quiett that she and Mr. Walker had physical custody of the children, and that they "had the

---

[2] At this time, Officer Quiett was between Ms. Mulet and Ms. Kelly, with Ms. Kelly several feet behind Officer Quiett.

paperwork filed and everything" for custody. (Quiett Audio at 5:02). Both women continued to argue, and Officer Quiett again found it necessary to tell them to calm down. When Ms. Mulet yelled at Ms. Kelly once again, Officer Quiett told her that she was "going to get charged with disorderly conduct if you do not stop friggin yelling," to which Ms. Mulet responded that her mom would bail her out of jail. (<u>Id</u>. at 5:15). Again Officer Quiett said, "I need you two to stop yelling at each other back and forth and making such a big deal out of it." (<u>Id</u>. at 5:25).

Ms. Mulet told Officer Quiett that Ms. Kelly needed to get away from her house, but Officer Quiett told her that Ms. Kelly was not on Ms. Mulet's property and had every right to be there. Officer Quiett once again told Ms. Mulet to "stop yelling." Ms. Mulet stated that Ms. Kelly had no legal custody, and that she and Mr. Walker were getting legal custody of the children. At this point, Mr. Walker piped in, and both were speaking to Officer Quiett with raised voices.

When Officer Springs arrived on the scene, he began speaking with Ms. Kelly. Officer Quiett then went to speak with Ms. Kelly while Officer Springs spoke with Mr. Walker and Ms. Mulet. Ms. Kelly was calm at this point and told Officer Quiett that she and Mr. Walker always got along, that they had never gone to court, and that no paperwork had been filed regarding the children. Officer Quiett told her to go down to the park where the children were, and that he would be down there shortly.

Officer Quiett then walked up to Officer Springs, who told Officer Quiett that he needed to talk to Mr. Walker because Mr. Walker would not listen and had turned his back on Officer Springs. After asking both the officers their names, Mr. Walker said, "like my lawyer told me, she can't take those kids." (<u>Id</u>. at 9:16). Mr. Walker again reiterated that Ms. Kelly was not leaving with his

children and, when Officer Quiett told him that they were, Mr. Walker said, "you a goddamn liar,"[3] and "this is bullshit man." (Id. 9:32).

Mr. Walker began strolling down the street while Ms. Mulet (who had gone down to the park to get the children) was walking up the street with one of the children.[4]  Both officers approached the couple, who were now standing near one another.

By this point, Ms. Mulet was nothing short of hysterical and  began screaming.  At the time, Mr. Walker was directly in front of Officer Quiett, and Officer Springs placed his hands on Mr. Walker's arms and lightly pushed him back.  Mr. Walker began walking away and repeatedly exclaimed, "don't touch me man," and can be heard in the background exclaiming "fuck you man" and "get away from me."[5] (Id. at 9:52 & 9:56).

Officer Quiett told Ms. Mulet that Ms. Kelly would be taking the children, to which Ms. Mulet yelled, "she can't take them, they're here in our yard" and "she can't come here and snatch these fucking kids." (Id.  at 10:09-10:15).  Officer Quiett said, "I understand."  Apparently crying now, Ms. Mulet said, "she doesn't give a shit, she's a sorry-ass crackhead bitch . . . she doesn't give a fuck about the kids."  (Id. at 10:22 & 10:32).  Again, Officer Quiett said, "I understand." (Id. at 10:24).  Ms. Mulet then said, "she's not even here to get these kids, she had to drop off some other kids, she doesn't even give a fuck about seeing them."  (Id. at 10:34).

---

[3]  Defendants claim that this statement was directed at Officer Quiett, but that is not clear from the tape.  Although Mr. Walker was looking at Officer Quiett, he may have actually been directing this comment at Ms. Kelly because she did not agree with his statement that the children had been living with him for three years.

[4]  Ms. Mulet went down to the park to retrieve the children shortly after Officer Quiett stopped speaking with Ms. Kelly.  She claims she did so with Officer Quiett's permission.

[5]  At this point, neither Mr. Walker nor Officer Springs can be seen on the tape because they are standing in front of Ms. Kelly's Cadillac, which was parked next to the curb.

Ms. Mulet then stated, or asked, "so we can . . . follow her to snatch these kids back?" (<u>id</u>. at10:40), to which Officer Quiett replied, "no, because in the state of Tennessee, the mother has full custody." (<u>Id</u>. at 10:41).  Ms. Mulet said, "no, she does not have full custody because we have papers in court."  (<u>Id</u>. at 10:48).  Officer Queitt said, "you have to show me the paperwork before I can do that," (<u>id</u>. at 10:49),  by which he apparently meant allow the children to stay.

Ms. Mulet then grabbed the child who was standing next to her by the hand, and began walking away.  Officer Quiett tried to stop her by placing his hands on the child, prompting Ms. Mulet to yell "let go of my daughter." (<u>Id</u>. at 10:51).

In the process of trying to pull the child away, Ms. Mulet turned around so that she was between the child and Officer Quiett.  A scuffle ensued with Officer Quiett grabbing hold of Ms. Mulet while Ms. Mulet retained her grip on the child.  Officer Quiett told her to let go of the child and moved her up against Ms. Kelly's car.  Ms. Mulet continued to struggle and yelled at him to stop.

At this point, Ms. Mulet was screaming and being held by Officer Quiett.  Mr. Walker then approached, entered the fray, and screamed, "let go of her," (<u>id</u>. at11:14), at which point he was grabbed by Officer Springs, who then put his hands on Mr. Walker's arms and backed Mr. Walker across the street.  Ms. Mulet was then handcuffed.  While being led away from Ms. Kelly's car, Ms. Mulet yelled,  "you fucking pig, we'll see." (11:20).

The camera in Officer Springs' vehicle captured most of the events leading up to Mr. Walker's arrest, some of which overlaps that captured by Officer Quiett's audio and video.  To avoid excessive redundancy, the Court picks up at the time that Ms. Mulet returned from the park.

Mr. Walker was not on camera at the time, but can be heard yelling in the background,

"don't touch me man," "fuck you," and "get away from me, get away from me ... you can't take my kids away from me." (Id. at 9:25 - 9:28). He then shouted, "you better get away from me while I've got my daughter, I'm telling you man." (Id. at 9:33). He repeated that his children were not going to be taken away from him and was told by Officer Springs, "you're about thirty seconds away from going to jail." (Id. at 9:40). Again Mr. Walker stated, "I haven't done anything, I haven't done anything." (Id. at 9:46). Officer Springs explained, "we're trying to make it better for you, and you're making it far worse" and he told Mr. Walker to "shut-up and listen." (Id. at 9:54).

As captured on Officer Quiett's microphone, Mr. Walker was told that when "there's no paperwork, everything falls on the maternal mother." (Id. at 10:10). Mr. Walker was also told that if he called is lawyer, the lawyer would tell him the same thing, that his girlfriend had "no rights" to the children and that "it doesn't matter who they live with." (Id. at 10:10 - 10:23). Mr. Walker then yelled, "don't touch me man, he's grabbing my daughter. (Id. at 10:28). Mr. Walker was told to calm down.

While Mr. Walker was yelling and Ms. Mulet was screaming, videotape footage shows that Mr. Walker was pushed across the street by Officer Springs. It is clear from the tape that Mr. Walker was not being entirely compliant, as he was leaning in towards Officer Springs.[6]

When Mr. Walker reached the curb, he began yelling at Officer Springs, who had his fist against Mr. Walker's chest. Mr. Walker pushed Officer Springs's hand away, prompting Officer Springs to try to grab him while Mr. Walker backed up. For just a second, they disappeared from the camera's view.

When they reentered the picture, the two were struggling. Mr. Walker began a hasty retreat

---

[6] Mr. Walker is substantially larger than either of the officers, both in terms of height and weight.

down the street and was told that he was about to be tased.  As  Mr. Walker reached towards the taser in Officer Springs's hand, one or both of the officers yelled at him to get on the ground. Instead, he began to run down the street, with both officers in pursuit.  After a few feet, Officer Springs fired his taser and Mr. Walker fell to the ground screaming.  The officers shouted at him to roll over onto his stomach and was repeatedly told him to put his hands behind his back. Immediately after he complied, Mr. Walker was handcuffed.  Officer Springs then said, "I told you, told you, and told you to calm down, you didn't want to listen." (Id. at 11:41).

 Less than a minute elapsed between the time that Mr. Walker was guided across the street until he was handcuffed.  According to a report generated by the taser, the taser was fired by Officer Springs one time, for a total duration of eight seconds.

Both Plaintiffs were charged in the General Sessions Court of Putnam Count with disorderly conduct. Mr. Walker was also charged with evading arrest.  Those charges were dismissed by the court at the preliminary hearing.

Based upon the foregoing events, Plaintiffs filed suit in this Court. They bring federal claims under the First, Fourth, and Fourteenth Amended for unlawful arrest, excessive force, malicious prosecution, and the denial of due process.  They also bring state law claims for assault and battery, negligence, conspiracy, and the negligent infliction of emotional distress.

## II.  STANDARD OF REVIEW

The standards governing summary judgment motions are well known.  A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000).   A genuine issue exists "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

As indicated, Plaintiffs bring both federal and state-law claims. The Court begins with the federal claims because the disposition of those claims affects the Court's ruling on the state-law claims.

### A. Federal Claims

The federal claims, alleging violations of the First, Fourth, and Fourteenth Amendments, are brought pursuant to 42 U.S.C. § 1983,[7] which, so far as relevant, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. In order to state a claim under this statute, "a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law." Harbin-Bey v. Rutter, 420 F.3d 571, 574 (6th Cir. 2005). Here, there is no dispute that Officers Quiett and Springs were acting under state law when they detained and arrested Plaintiffs on July 3, 2011.

---

[7] Plaintiffs also invoke 42 U.S.C. § 1988, which allows the recovery of attorney's fees by successful civil rights litigants.

Thus, the questions become whether those officers deprived Plaintiffs of a clearly established constitution right and, if so, whether Defendant Cookeville Police Department is also liable for that deprivation.

### *1. Fifth and Fourteenth Amendment Claims*

In response to the Motion for Summary Judgment filed by the individual officers, Plaintiffs concede that those Defendants "are entitled to summary judgment on Plaintiffs' claims under the First and Fourteenth Amendments to the United States Constitution as Plaintiffs' claims are covered under the Fourth Amendment to the United States Constitution." (Docket No. 55 at 6). Accordingly, summary judgment will be granted on Plaintiffs' Fifth and Fourteenth Amendment claims.

### *2. Fourth Amendment Claims*

Plaintiffs bring Fourth Amendment claims against both Officer Quiett and Officer Springs for false arrest, malicious prosecution, and excessive force.

#### a. False Arrest

"[T]he federal right to be subject only to arrest upon probable cause [i]s clearly established." Everson v. Leis, 556 F.3d 484, 500 (6th Cir. 2009). "Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). The determination of whether probable cause exists is based upon the "totality of the circumstances," id. at 238, with the critical question being "whether at the time of the arrest, 'the facts and circumstances within the [arresting officer's] knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual had either committed or was

committing an offense.'" United States v. Torres-Ramos, 536 F.3d 542, 555 (6th Cir. 2008) (quoting, Beck v. Ohio, 379 U.S. 91 (1964)).

"'When no material dispute of fact exists, 'probable cause determinations are legal determinations that should be made' by the court." Alman v. Reed, 2013 WL 64370 at *6 (6th Cir. Jan. 7, 2013) (quoting Hale v. Kart, 396 F.3d 721, 728 (6th Cir. 2005)). "But '[i]f disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts.'" Id.

Plaintiffs were arrested for disorderly conduct. So far as relevant, Tennessee's disorderly conduct statute provides:

> (a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:
>
>> (1) Engages in fighting or in violent or threatening behavior;
>>
>> (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
>>
>> (3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
>
> (b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.

Tenn. Code Ann. § 39-17-305.

In their response to Defendants' Motion for Summary Judgment, Plaintiffs argue:

> . . . In this case neither Plaintiff was guilty of disorderly conduct. Neither engaged in fighting or in violent or threatening behavior. Neither ignored an order to disperse. Neither created a hazardous or physically offensive condition by any act that served no legitimate purpose. All of their actions were in furtherance of protecting Mr. Walker's children from a dangerous situation. Neither made unreasonable noise that prevented others from carrying on lawful activities. Upon being told that allowing the children to leave with Ms. Kelly would be dangerous for the children the officers

should have contacted the Department of Children's Services.

(Docket No. 55 at 7).

Whether Plaintiffs were actually guilty of disorderly conduct, whether they were trying to protect the children, and whether the officer should have called Children Services are all beside the point. The question is whether there was probable cause to make an arrest; "a reasonable ground for belief of guilt . . . does not require evidence that is completely convincing[.]" Harris v. Borhorst, 513 F.3d 503, 511 (6th Cir. 2008).

A reasonable officer could conclude that Plaintiffs engaged in disorderly conduct because the Tennessee Supreme Court has held that a defendant's disregard of a police officer's instructions, coupled with a challenge to the officer's authority, can support a disorderly-conduct charge. State v. Mitchell, 343 S.W.3d 381, 390-91 (Tenn. 2011). The Tennessee Court of Criminal of Appeals has also held that yelling and screaming and being "almost combative" can support such a charge. State v. Padgett, 2012 WL 1648390, at *11 (Tenn. Crim. App. May 9, 2012). Additionally, a reasonable officer could believe Plaintiffs violated subsection (b) of the statute because they made "unreasonable noise" that prevented the officers from performing their duties at the scene.

According to the videotapes and audiotapes, which the Court may consider on summary judgment to the extent they "blatantly contradict" Plaintiffs' version of the facts, Scott v. Harris, 550 U.S. 372, 380–82 (2007),[8] Ms. Mulet repeatedly yelled and screamed at both Ms. Kelly and the officers. She appeared to become hysterical and, when Officer Quiett moved to handcuff her, she fought with him. As for Mr. Walker, the video and audio recordings reveal that he was verbally

---

[8] In Coble v. City of White House, 634 F.3d 865, 868–69 (6th Cir. 2011), the Sixth Circuit extended Scott's reasoning to audiotapes.

abusive and yelled and screamed at the officers.  He also slapped Officers Springs's hand, tussled with him, and attempted to flee.  This was more than enough conduct for a reasonable officer to conclude that both Plaintiffs engaged in disorderly conduct.

Mr. Walker was also charged with evading arrest, but whether that was proper is really of no moment because the Supreme Court has held that if an officer has probable cause to arrest a suspect for *any* crime, there is no Fourth Amendment violation, even if the police officer lacked probable cause to arrest for the actual offense charged.  Devenpeck v. Alford, 543 U.S. 146, 153-55 (2004).  Regardless, it is "unlawful for any person to intentionally flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person: (A) knows the officer is attempting to arrest the person[.]"  Tenn. Code Ann. § 39-16-603.   There is no dispute that Mr. Walker knew Officer Springs to be a Cookeville Police Officer and the tape clearly establishes that he tried to run away as Officer Springs attempted to restrain him.

### b.  Malicious Prosecution

Defendants seek summary judgment on Plaintiffs' malicious-prosecution claims, arguing that because their false-arrest claims fail, so do their malicious-prosecution claims.  Plaintiffs do not address this argument.

The Sixth Circuit "has recognized a § 1983 claim for malicious prosecution arising under the Fourth Amendment, but the contours of such a claim remain uncertain."  Fox v. DeSoto, 489 F.3d 227, 237 (6th Cir. 2007).  "What is certain, however, is that such a claim fails when there was probable cause to prosecute, or when the defendant did not make, influence, or participate in the decision to prosecute."  Id.; see Cheloas v. City of Harper Woods, 467 F. App'x 374, 378 (6th Cir. 2012) ("one consistent way in which a malicious prosecution claim fails is if the prosecuting parties,

or those influencing the decision to prosecute, had probable cause to pursue the criminal prosecution").

Since probable cause existed to arrest both Plaintiffs, summary judgment is appropriate on their malicious prosecution claim.  See Rainey v. Patton, 534 F. App'x 391, 398 (6th Cir. 2013) ("an officer has probable cause to prosecute if, at the time he initiated criminal proceedings, the information he possessed would lead a reasonable officer to conclude that the arrestee had committed the charged offense").

### c. Excessive Force

In Graham v. Connor, the Supreme Court held "that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" 490 U.S. 386, 395 (1989) (italics in original).  The Court went on to hold that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]" Id. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." Id.

In making the reasonableness calculation, Graham instructs courts to look at the severity of the crime, whether the subject posed an immediate threat to the safety of the officers or others, and whether the subject was resisting arrest.  Id.  "In determining whether there has been a violation of the Fourth Amendment, [a court] considers not the 'extent of the injury inflicted,' but whether an officer subjects a detainee to 'gratuitous violence.'" Miller v. Sanilac County, 606 F.3d 230, 252 (6th Cir. 2010)) (quoting Morrison v. Bd. of Tr. of Green Twp., 583 F.3d 394, 400 (6th Cir. 2009)).

Although disorderly conduct is generally not considered a violent crime, <u>Carpenter v. Bowling</u>, 276 F. App'x 423, 426 (6th Cir. 2008), "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Graham</u>, 490 U.S. at 396. As a consequence, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." <u>Id</u>. at 397 (internal quotation marks omitted).

With regard to the arrest of Ms. Mulet, Plaintiffs have not produced even a scintilla of evidence that suggests the force utilized by Officer Quiett was excessive, or that he used gratuitous violence. To the contrary, at the time Ms. Mulet was arrested, she was hysterical, and Officer Quiett merely grabbed her, attempting to obtain control. She was never struck or kicked, nor was she injured in any way. Ms. Mulet's excessive-force claim fails as a matter of law.

Resolution of Mr. Walker's excessive-force claim is more difficult. Defendants argue that "application of the taser on Mr. Walker was unquestionably reasonable under the circumstances." (Docket No. 52 at 13). In support of that position, Defendants rely primarily on <u>Caie v. West Bloomfield Township</u>, 485 F. App'x 92 (6th Cir. 2012).

In <u>Caie</u>, the Sixth Circuit found that plaintiff's right to be free from excessive force was not violated when he was tased once in "drive stun" mode and where plaintiff (1) had consumed a large quantity of alcohol and drugs; (2) was acting erratic and suicidal; (3) proclaimed his desire to have the officers use deadly force; and (4) tried to flee by getting into his car and driving off. Mr. Walker's actions pale by comparison and he was not tased in drive stun mode.[9] Moreover, the other

---

[9] "Most tasers have two modes: dart mode and drive-stun mode." <u>Thomas v. Plummer</u>, 486 F. App'x 116, 126 n.10 (6th Cir. 2012). "A drive stun is performed after the probes are removed from the taser [and] reduces the amount of force employed on a person in close range." <u>Flowers v. City of Melbourne</u>, 2014 WL 715609, at *3 n.6 (11th Cir. Feb. 26, 2014); <u>see</u> <u>Rossevelt-Hennix v. Prickett</u>, 717 F.3d 751, 756 (10th Cir.

cases Defendants cite do not compel the conclusion that Officer Springs' actions were justifiable as a matter of law.

The inquiry does not end, however, because Defendants have invoked qualified immunity as a defense. Qualified immunity is an affirmative defense which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity inquiry involves determining (1) whether a constitutional violation occurred and (2) whether the right infringed was clearly established. McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005). A court is to use its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

"When the defense of qualified immunity is raised, it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir. 2006). Preliminarily, "plaintiff has the burden of showing that a right is clearly established." Everson v Leis, 556 F.3d 484, 494 (6th Cir. 2009).

In response to Defendants' Motion for Summary Judgment, Plaintiffs argue "[t]he right to be free from excessive force during an arrest is a clearly established right for qualified immunity purposes," and relies upon Graham for that proposition. (Docket No. 55 at 9). But, as the Supreme Court later pointed out in Saucier v. Katz, 555 U.S. 194, 205 (2001), "Graham does not always give a clear answer as to whether a particular application of force will be deemed excessive by the

---

2013) (in drive stun mode, "the taser delivers an electric shock, but does not cause an override of an individual's central nervous system as does a taser in dart probe mode").

courts." Accordingly, to determine whether a right was clearly established, the Court looks first to decision of the Supreme Court and then to the case law of the Sixth Circuit. <u>Clemente v. Vaslo</u>, 679 F.3d 482, 490 (6th Cir. 2012).

While no Supreme Court decisions provide an answer as to whether the deployment of a taser under the circumstances presented here would violate a clearly established right, a decision from the Sixth Circuit indicates that it would not. In <u>Cockrell v. City of Cincinnati</u>, 468 F. App'x 491, 495 (6th Cir. 2012), the Sixth Circuit was presented with the question of "whether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command, had a clearly established right not to be tased on July 3, 2009." Canvassing the law in the area, the court observed that "cases addressing qualified immunity for taser use fall into two groups":

> The first involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers. In the face of such resistance, courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident.
>
> \*                              \*                              \*
>
> In the second group of cases, a law-enforcement official tases a plaintiff who has done nothing to resist arrest or is already detained. Courts faced with this scenario hold that a § 1983 excessive-force claim is available, since "the right to be free from physical force when one is not resisting the police is a clearly established right."

<u>Id</u>. (citation omitted) (collecting cases).

Noting that the case before it did "not cleanly fit within either group" because plaintiff did "not use violence, make threats, or even disobey a command to stop" but, rather, "simply fled," the Sixth Circuit concluded that it was "not clear whether tasing a suspect who fled from the scene of a nonviolent misdemeanor constituted excessive force as for July 2008," nor was there a consensus that taser use [wa]s categorically improper, unsafe, or cruel." <u>Id</u>. at 498. As such, the police offer

was entitled to qualified immunity. Given <u>Cockrell</u> and the cases cited therein, the Court has little hesitation in concluding that Officer Springs' tasing of Mr. Walker did not violate a clearly established right.[10]

That said, the length of time that Mr. Walker was tased gives the Court some pause for concern. According to the taser records, Officer Springs engaged his taser for eight seconds.[11] Most cases that have addressed the use of a taser have done so in the in the context of the taser being activated for five seconds or less, presumably because the typical taser, once triggered, apparently cycles for five seconds. <u>See</u> <u>Brown v. Weber</u>, 2014 WL 552998, at *1 (6th Cir. Feb. 13, 2014); <u>Lee v. Metro. Gov't of Nashville & Davidson Cnty</u>, 432 F. App'x 435, 438 n.1 (6th Cir. 2011). Whether an additional three seconds was necessary in this case is unclear from the videotape. While Mr. Walker was not compliant until the tasing stopped, this may have been to an involuntary neuro-muscular reaction caused by the electrical impulses, and not a conscious decision to ignore the officer's commands.

Nevertheless, "[w]hile the nine [or here, eight] second cycle is troubling to this Court, given the conditions at the moment, when a five second cycle would have been the minimum, this Court cannot say that the additional four [or here, three] seconds, while perhaps constituting excessive

---

[10]   Although the incident in this case took place some three years after the incident at issue in <u>Cockrell</u>, the Sixth Circuit stated that the "broad principles" discussed in the cases did "not establish the contours of the right [the officer] allegedly violated so clearly that every reasonable officer would know his actions were unconstitutional, even today," February 23, 2012. <u>Id</u>.

[11]   The taser records also indicated that Officer Springs apparently uses his taser with some frequency, a matter which may also raise concerns. Although the question of whether an officer may be trigger happy does not impact the qualified immunity analysis because the "doctrine focuses on 'the objective reasonableness of an official's conduct,'" <u>Andrews v. Hickman Cnty</u>, 700 F.3d 845, 953 (6th Cir. 2012), "without regard to [an officer's] underlying intent or motivation" <u>Graham</u>, 490 U.S. at 397, this is something that the Cookeville Police Department may want to investigate.

force, violated clearly established law[.]" Rakestrau v. Neustrom, 2013 WL 1452030, at *11 (W.D. La. April 8, 2013). Simply put, "[t]he case law must 'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.'" Clemente, 679 F.3d at 490 (citations omitted). Because "the law did not put [Officer Springs] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier, 533 U.S. at 202.

### d. Municipal Liability

Plaintiffs sue the Cookeville Police Department under a failure-to-train theory.[12] In Monell v. Department of Social Servives., 436 U.S. 658, 691 (1978), the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." However, "municipalities may be held liable under § 1983 when the injury inflicted is a result of 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Radavansky v. City of Olmstead Falls, 395 F.3d 291, 311 (6th Cir. 2005) (quoting Monell, 436 U.S. at 694).

Plaintiffs' municipal liability claim against the police department fails for two reasons. First, "[i]f the plaintiff fails to establish a constitutional violation by an individual officer, the local government unit cannot be held liable for a failure to train under § 1983." Crocker v. County of Macomb, 119 F. App'x 718, 724 (6th Cir. 2005); see Estate of Harbin v. City of Detroit, 147 F.

---

[12] They also sue Officers Quiett and Springs their official capacities. Claims against local officers in their official capacities are essentially suits against the governmental entity that employs them. Everson, 556 F.3d 484, at 493 n.3.

App'x 566, 572 (6th Cir. 2005) ("we have repeatedly declined to examine whether a municipal defendant provided its jail officers with adequate training when the plaintiff-detainee failed to present sufficient evidence of an underlying constitutional tort"). Second, and assuming that this Court's decision about the liability of either Officer Quiett or Officer Springs is incorrect, summary judgment on Plaintiffs municipal liability claims is appropriate because they have not established the necessary requirement of such a claim.

Though "[t]he courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability," Gregory v. City of Louisville, 444 F.3d 725, 753 (6th Cir. 2006), "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton v. Harris, 489 U.S. 378, 390-91 (1989). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Id. at 392. Therefore, and because any "lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983," id. at 391, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick, 131 U.S. at 1359 (citation omitted). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the *training in this particular area was deficient and likely to cause injury*.'" Fisher v. Harden, 398

F.3d 837, 849 (6th Cir. 2005) (emphasis added) (citation omitted).

In their brief, Plaintiffs argue that "[r]egarding training, it became apparent through the proof taken in this case that the officers did not have the necessary training to address a situation like the one they were confronted with in the case at bar." (Docket No. 50 at 7). They also contend that "[t]he City of Cookeville Police Department did not have specific guidelines for how an officer is to deal with custody." (Id.).

The former assertion about addressing a situation like the one at hand is too nebulous to support a failure-to-train claim. The latter assertion about the lack of guidelines is belied by the record because the Cookeville Police Department had a 2001 General Order which sets forth "guidelines for providing and promoting the consistent and effective response to domestic violence crime," (Docket No. 53-2 at 7), and both officers were given training on how to handle domestic violence issues. Moreover, the officers repeatedly attempted to diffuse the situation, and the advice that they repeatedly gave (or tried to give) Plaintiffs was correct as a matter of state law. See, Tenn. Code Ann. § 36-2-303 ("Absent an order of custody to the contrary, custody of a child born out of wedlock is with the mother").

In any event, Plaintiffs have failed to show prior instances of unconstitutional conduct, be it in regard to the handling of domestic situations or the inappropriate use of tasers that would show the City of Cookeville was on notice and ignored a history of abuse. Plaintiffs simply have not carried their burden to establish municipal liability.

## B. State Law Claims

In Count IV of the Complaint, Plaintiffs bring state law claims for negligence, assault and battery, the negligent infliction of emotional distress, and conspiracy against the individual

Defendants, and further allege that the City of Cookevile is liable for these claims, to the extent that it has not waived immunity under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101 *et seq.* Plaintiffs also "refer the Court to T.C.A. § 8-8-301 and § 8-8-302." (Complaint, Docket No. 1 at 17). However, because the Court finds that Plaintiffs' state law claims against Officers Quiett and Springs fail as a matter of law, their state law claims against the City of Cookeville Police Department necessarily fail as well.

### 1. Assault and Battery

"Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action." Griffin v. Hardricl, 604 F.3d 949, 956 (6th Cir. 2010). "That is, 'whether the analysis concerns whether an officer violated a plaintiff's constitutional rights by using excessive force or whether the analysis concerns whether an officer committed state-law battery by using force that was 'clearly excessive,' the same principles . . . are applied.'" Id. (quoting Lee v. Metro. Gov't of Nashville & Davidson County, 596 F. Supp. 2d 1101, 1118 (M.D. Tenn. 2009)).

The Court has ruled that Plaintiffs' excessive force claims fails and, thus, dismissal of their assault and battery claims is appropriate. Moreover, a police officer is "not liable for assault and battery in connection with a use of force he or she is statutorily authorized to employ," and "'officers are privileged to commit a battery pursuant to a lawful arrest, subject to the excessive force limitation.'" Brown v. Christian Bros. Univ., 2013 WL 3982137, at *16 (Tenn. Ct. App. Aug. 5, 2013) (citation omitted).

### 2.  *Negligence and Negligent Infliction of Emotional Distress*

Officers Quiett and Sparks are immune from suit on Plaintiff's negligence claims pursuant to Tenn. Code Ann. § 29-20--310(b).  That statute provides that no claim may be brought against a governmental employee for which the immunity of the governmental entity is removed, and Tenn. Code Ann. § 29-20-205 removes "immunity for suit of all governmental entities . . . for injury proximately caused by a negligent act or omission of any employee within the scope of his employment[.]"  See, Sullivan v. Wilson County, 2012 WL 1868292, at *5 (Tenn. Ct. App. May 22, 2012); Goot v. Metro. Gov't of Nashville & Davidson Cnty, 20005 WL 3031638, at *4 (Tenn. Ct. App. Nov. 9, 2005).[13]

To the extent that Plaintiffs seek to hold the City of Cookevile liable for the officers' alleged negligence, such a claim also fails.  They have not argued, let alone shown, "(1) a duty of care owed by the defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause," Satterfield v. Breeding Insulation Co., 266 S.W.3d 347, 355 (Tenn. 2008), which are the essential elements of any negligence claim.

### 3.  *Conspiracy*

Plaintiffs' entire response to Defendants' Motion for Summary Judgment on their conspiracy claim is as follows:

> As shown above the underlying conduct of the officers was wrongful.  They combined to accomplish the unlawful purpose of arresting the Plaintiffs.  In the event the Court should determine that the arrests were lawful Plaintiffs have shown above

---

[13] Although Plaintiffs argue that, under the statute, immunity from suit is not removed for the "infliction of mental anguish," the Tennessee Supreme Court has specifically held that the phrase applies only to the intentional and not the negligent infliction of emotional distress.  Sallee v. Barrett, 171 S.W.3d 822, 826 (Tenn. 2005).

that the means used to effect the arrests were excessive and thus unlawful.

(Docket No. 55 at 13). If "conclusory allegations are insufficient to state a plausible claim that Defendants conspired to deprive them of their constitutional rights in violation of 42 U.S.C. § 1983," Faith Baptist Church v. Waterford Tp., 522 F. App'x 322, 329 (6th Cir. 2013), they most definitely are insufficient to survive a motion for summary judgment because "[o]nce the moving party has met its burden of production, the nonmoving party must 'go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Plaintiffs have failed to do so.

## IV. CONCLUSION

On the basis of the foregoing, the Motions for Summary Judgment filed by Defendants will be granted, and Plaintiffs' claims will be dismissed. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE